(C.D. 4469)

RACHELLE LABORATORIES, INC. v. UNITED STATES

Court Nos. 71-10-01457 and 72-4-00812

(Decided September 14, 1973)

*Glad, Tuttle & White* (*Edward N. Glad* and *Gerald A. Koris* of counsel) for the plaintiff.

*Irving Jaffe,* Acting Assistant Attorney General (*Joseph I. Liebman,* trial attorney), for the defendant.

WATSON, Judge: In this case, the court is asked to decide whether the district director of customs was correct in finding that the imported merchandise, chlortetracycline hydrochloride, was not a natural substance. This involves the question of whether the imported

merchandise has been subjected to a chemical reaction which changed the molecular structure of the original natural antibiotic. The claim covering the merchandise in entry 127340 of protest 27041001533 in Court No. 71–10–01457 having been abandoned is hereby dismissed.

This merchandise was classified as antibiotics, albeit, other than natural and not artificially mixed under TSUS item 437.32, as modified by T.D. 68–9, dutiable at the rate of 8 percent ad valorem or 7 percent ad valorem, depending upon the date of importation. Plaintiff agrees that this merchandise is an antibiotic. However, plaintiff contends that this antibiotic is natural and not artificially mixed as provided for in TSUS item 437.30, as modified by T.D. 68–9 and dutiable at the rate of 2 percent ad valorem. For the purpose of clarification, the following definitions and provisions are taken from the Tariff Schedules of the United States:

Schedule 4 headnotes:

\*     \*     \*     \*     \*     \*     \*

2. (a) The term "compounds", as used in this schedule, means substances occurring naturally or produced artificially by the reaction of two or more ingredients, each compound—
(i) consisting of two or more elements,
(ii) having its own characteristic properties different from those of its elements and from those of other compounds, and
(iii) always consisting of the same elements united in the same proportions by weight with the same internal arrangement.

\*     \*     \*     \*     \*     \*     \*

3. (a) The term "mixtures", as used in this schedule, means substances consisting of two or more ingredients (i.e., elements or compounds), whether occurring as such in nature, or whether artificially produced (i.e., brought about by mechanical, physical, or chemical means), which do not bear a fixed ratio to one another and which, however thoroughly commingled, retain their individual chemical properties and are not chemically united. The fact that the ingredients of a product are incapable of separation or have been commingled in definite proportions does not in itself affect the classification of such product as a mixture.

Schedule 4, part 3:

Part 3 headnotes:

\*     \*     \*     \*     \*     \*     \*

3. For the purposes of this part—
a. "natural substances" are those substances found in nature which comprise whole plants and herbs, anatomical

parts thereof, vegetable saps, extracts, secretions and other constituents thereof; whole animals, anatomical parts thereof, glands or other animal organs, extracts, secretions and other constituents thereof, and which have not had changes made in their molecular structure as found in nature;

\*   \*   \*   \*   \*   \*   \*

Subpart B:

Antibiotics:

| | | |
|---|---|---|
| 437.30 | Natural and not artificially mixed _____ | 2% ad val. |
| 437.32 | Other _____ | 8% ad val. [1969] |
| | | 7% ad val. [1970] |

The testimony of the witnesses has produced a difference of opinion as to the status of chlortetracycline hydrochloride (hereafter called CTC.HCL) and whether it is found in nature. Plaintiff presented a series of witnesses beginning with Mr. Charles V. Carroll who was in charge of production for Rachelle Laboratories and was personally familiar with the method of fermentation and extraction used to obtain chlortetracycline (hereafter called CTC) and CTC.HCL. Also appearing for plaintiff was Dr. Melvin Hochberg, president and general manager of plaintiff herein whose credentials established his expertise in chemistry to the satisfaction of the court.

Plaintiff's witnesses testified that it was their belief that CTC is found in nature but that there are no known commercial sources in nature of either CTC or CTC.HCL. Dr. Hochberg stated that CTC is produced naturally by microorganisms as essential, natural defenses against other organisms around them. Both Mr. Carroll and Dr. Hochberg testified CTC.HCL is present during the natural growth of CTC (an opinion later disputed by defense witnesses). Dr. Hochberg added that the organisms cannot produce CTC in other than an acid pH and in an acid pH the chloride-ion is present as HCL. Mr. Carroll said that during fermentation HCL becomes "loosely associated" with CTC molecule but he was not sure if a chemical bond takes place during the "loose association". He also was not sure if the "loose association" could be broken by physical means. This witness also admitted that his usage of CTC and CTC.HCL interchangeably may have been incorrect.

Witnesses for both parties agree that the only commercial production of CTC is through fermentation. In the process of fermentation, a microorganism metabolizes the materials with which it is combined, producing a small amount of chlortetracycline. Testimony indicates that about 1 percent CTC is present once fermentation has ceased. To remove the chlortetracycline from the batch, one method is to add

butanol and hydrochloric acid and with agitation and aging CTC.HCL is formed. This is then recovered by filtration, drying and packing. Another method used to remove the 1 percent of CTC would be to raise the pH of the medium so that it becomes alkaline and filter the insoluble CTC.

Defendant presented two witnesses, Dr. Milton Petty, professor of microbiology at California State University who was familiar with CTC from his work at American Cyanamid, and Dr. John Quinn, a chemist employed by the U.S. Customs Laboratory. Dr. Petty testified that CTC and CTC.HCL are different substances. Theoretically, some CTC.HCL might be formed in the medium when CTC is produced, but he knew of none, and stated the available facts were to the contrary. To elaborate on the difference between CTC and CTC.HCL, Dr. Petty pointed to the difference in the following area: (1) melting points; (2) optical rotations; (3) solubilities; (4) infrared spectrums and (5) element analyses. CTC.HCL according to Dr. Petty, is more useful as an antibiotic than CTC because the former is more soluble in water and is therefore more readily absorbed by the gut upon administration. In his opinion, the molecular structure of CTC has been added to and changed when making CTC.HCL.

The witness contrasted the formation of CTC.HCL, which he opined could not occur at the fermentation pH with the precipitation of CTC by calcium. Due to the universal presence of calcium in soil, there was a distinct possibility that the formation of the calcium complex would occur in nature as a natural incident of production. This would differ from the formation of CTC.HCL which could not form under the natural conditions of fermentation due to the improbability that conditions of an acidic pH would ordinarily be found in the fermentation area.

We have heard differing testimony on the point of whether the addition of hydrochloride during the manufacturing process changed the identity of the chlortetracycline. Plaintiff has argued that it is the CTC molecule in its original form which is essential as an antibiotic and the addition of HCL is only one of two ways to stabilize it. Defendant has pointed out that only CTC.HCL is used as an antibiotic arguing that this emphasized its distinctness from the original CTC. The parties differ as to the precise relation between the CTC and the HCL in CTC.HCL. Plaintiff says it is a "loose association" without a chemical reaction but with a change in physical properties. Defendant says it is a chemical reaction resulting in a new substance possessing changed physical characteristics.

In evaluating the testimony, the first conclusion which emerges is

that CTC.HCL has not been shown to be produced in nature. I am not convinced, as a theoretical matter, that the necessary acidic pH conditions exist under normal natural conditions. In addition, I would prefer, even if the theoretical ground is secure, some persuasive indication that the theoretical reaction does indeed take place in nature. I would for the most part require this additional step in those cases where, as here, there is genuine dispute as to the natural occurrence of the particular chemical reaction.

Since CTC.HCL, unlike CTC, has not been proven to be produced in nature, the only theory which will permit classifying it as a natural substance, is one which treats the addition of HCL as not changing the molecular structure of the original CTC. Only thus can CTC.HCL be said to satisfy the headnote definition of natural substances as substances "* * * which have not had changes made in their molecular structure as found in nature."

In light of the most recent opinion of the Court of Customs and Patent Appeals on this subject, it would appear that any theory which discounts the addition of HCL to the CTC is untenable. In *United States* v. *Pharmacia Fine Chemicals, Inc.*, 59 CCPA 196, C.A.D. 1066 (1972), our appellate tribunal held that the the shortening of a long molecular chain by hydrolysis was a change of molecular structure, particularly when the shortening was done to produce the only range of lengths which was medicinally useful. It now seems to me that a similar conclusion is unavoidable here and moreover is required by *a fortiori* reasoning. If a mere change in the length of molecule is a "molecular change", the addition of an entirely new substance to the basic natural substance must be considered a molecular change. I am unable to treat the linking of CTC to HCL as anything less definite than a chemical bonding. In the present state of proof, I must conclude that any such linkage, created for the purpose of making the original natural substance medicinally useful as a practical matter, is one which changes the molecular structure of the substance to the point where it can no longer be considered a natural substance within the meaning of the tariff schedules.

In this regard, I must now follow the basic distinction between natural and synthetic substances drawn by our appellate tribunal in the *Pharmacia* case, *supra*—" * * *a distinction between those substances which have and those substances which have not undergone chemical changes subsequent to their 'natural' production."

For the above reasons I hold that plaintiff has failed to prove that CTC.HCL is a natural substance within the meaning of the statute and the classification as other than natural antibiotics was proper.

Judgment will issue accordingly.